## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| Danny Grigg, *individually and on behalf of all others similarly situated*, | Case No._____ |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| | **DECLARATORY RELIEF REQUESTED** |
| v. | |
| Fidelity National Financial, Inc., and LoanCare, LLC, | **PERMANENT INJUNCTIVE RELIEF REQUESTED** |
| Defendants. | **DEMAND FOR A JURY TRIAL** |

Plaintiff Danny Grigg ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class" or "Class Members"), brings this Class Action Complaint (the "Complaint") against Defendants Fidelity National Financial, Inc. ("Fidelity") and LoanCare, LLC ("LoanCare") (collectively, "Defendants"). The allegations set forth in this Complaint are based on the personal knowledge of the Plaintiff and upon information and belief and further investigation of counsel.

### NATURE OF THE ACTION

1.      Defendants are loan servicing and title companies that obtain highly sensitive data from consumers like Plaintiff and Class Members in the course of business. Defendants undertake a responsibility to use reasonable means in the protection of this data. Despite this responsibility, Defendants failed to implement and maintain reasonable data security measures. As a result, Defendants suffered a massive data breach in November 2023 that compromised the PII of Plaintiff and more than one-million other Class Members (the "Data Breach").

2.      The personally identifiable information ("PII") exposed or otherwise accessed by an authorized third-party in the Data Breach included Plaintiff's and the Class Members' full names, Social Security numbers, and loan numbers.

3.      Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiff and the Class, to keep their PII confidential, safe, secure, and protected from unauthorized disclosure or access.

4.      Plaintiff and the Class have taken reasonable steps to maintain the confidentiality and security of their PII.

5.      Plaintiff and the Class reasonably expected Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

6.      Defendants, however, breached their numerous duties and obligations by failing to implement and maintain reasonable safeguards; failing to comply with industry-standard data security practices and federal and state laws and regulations governing data security;  failing to properly train its employees on data security measures and protocols; and failing to timely recognize and detect unauthorized third parties accessing its system and that substantial amounts of data had been compromised.

7.      In this day and age of regular and consistent data security attacks and data breaches, in particular in the financial industries, and given the sensitivity of

the data entrusted to Defendants, this Data Breach is particularly egregious and foreseeable.

8.      By implementing and maintaining reasonable safeguards and complying with standard data security practices, Defendants could have prevented this Data Breach.

9.      Plaintiff and the Class are now faced with a present and imminent lifetime risk of identity theft or fraud. These risks are made all the more substantial, and significant because of the inclusion of their SSN and other static PII.

10.     PII has great value to cyber criminals, especially an individuals' SSN. As a direct cause of Defendants' Data Breach, Plaintiff's and Class Members' PII is in the hands of cyber-criminals and may be available for sale on the dark web for other criminals to access and abuse at the expense of Plaintiff and Class Members. Plaintiff and Class Members face a current and lifetime risk of identity theft or fraud as a direct result of the Data Breach.

11.     Plaintiff's and Class Members' PII was compromised due to Defendants' negligent and/or careless acts and omissions and the failure to protect Plaintiff's and Class Members' PII. Defendant's conduct amounts to negligence, recklessness, and/or violates federal and state statutes and guidelines.

12.     As a result of the Data Breach, Plaintiff and Class Members have experienced a loss of privacy similar to that caused by a disclosure of private facts or intrusion upon seclusion; lost time value of funds that are inaccessible due to

the Data Breach; time and effort spent attempting to mitigate the risk of harm from the Data Breach; lost benefit of bargain; diminished value of PII; and emotional distress proportional to the substantial risk of harm that he faces.

13.   Plaintiff and Class Members remain at imminent, impending, and substantial risk for additional tangible and intangible harm as a result of the Data Breach that has already occurred, as well as Defendants' continued possession of their PII.

14.   Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself and Class Members. Accordingly, Plaintiff seeks damages, declaratory judgment, and injunctive relief through claims for negligence, breach of implied contract, unjust enrichment, and relief under the declaratory judgment act.

## PARTIES

### *Plaintiff Danny Grigg*

15.   Plaintiff Danny Grigg is a natural person and citizen of North Carolina, where he intends to remain. Plaintiff's mortgage is held and/or serviced by Defendants.

### *Defendants*

16.   Defendant LoanCare, LLC is a leading national provider of full-service subservicing and interim subservicing to the mortgage industry and has offered its expertise and best practices in providing servicing solutions for others since 1991. At the present time, LoanCare subservices over 1.2 million loans in 50 states,

approximating $390 billion in loan balances. LoanCare, LLC, is a Virgina limited liability company whose principal place of business is at 3673 Sentara Way, Virginia Beach, Virginia 23452, and is authorized to transact business in Florida. Upon information and belief, the sole member of LoanCare, LLC, is Defendant Fidelity.

17.     Defendant Fidelity National Financial, Inc. is a leading provider of title insurance and transaction services to the real estate and mortgage industries. Fidelity is the nation's largest title insurance company through its title insurance underwriters—Fidelity National Title, Chicago Title, Commonwealth Land Title, Alamo Title and National Title of New York—that collectively issue more title insurance policies than any other title company in the United States. It is a Florida corporation whose principal place of business is at 601 Riverside Ave., Building 5, Jacksonville, Florida 32204.

18.     Defendants collected and continues to collect the PII of its customers and clients throughout its usual course of business operations.

19.     By obtaining, collecting, using, and deriving benefit from Plaintiff's and Class's PII, Defendants assumed legal and equitable duties to those persons, and knew or should have known that it was responsible for protecting Plaintiff's and Class's PII from unauthorized disclosure and/or criminal cyber activity.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), *et seq*. The amount in controversy

exceeds $5 million, exclusive of interest and costs. There are more than 100 members in the proposed Class, and at least one member of the Class (including Plaintiff) is a citizen of a state different from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

21.    This Court has personal jurisdiction over Defendants because Defendant Fidelity's principal places of business is located within this District and it conducts substantial business in this district, and because it is the sole member of Defendant LoanCare, which is also authorized to transact business in Florida and actually conducts substantial business in this district.

22.    Venue is proper in this Court under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District, and Defendant Fidelity resides within this judicial district.

## FACTUAL ALLEGATIONS

### *Background*

23.    Defendant LoanCare, LLC, performs or performed loan subservicing functions for Plaintiff's and Class Members' mortgage loan servicers. Upon information and belief, Defendant Fidelity is the sole member and operator of Defendant Loan Care, LLC.

24.    In the ordinary course of its business practices, Defendants store, maintains, and uses an individuals' PII, which includes Plaintiff and Class

Members', including but not limited to information such as: full names; Addresses; Social Security numbers; and loan numbers.

### *The Data Breach*

25.     On or about November 19, 2023, an unauthorized actor gained access to the Defendants' network and computer systems and obtained unauthorized access to Defendants' files.[1] (the "Data Breach").

26.     At least 1,316,938 individuals' information was affected by the Data Breach.[2] The information exposed or otherwise accessed by an authorized third-party in the Data Breach included Plaintiff's and the Class Members' name, Social Security number, and loan number.[3] Collectively, the information described in this paragraph shall be referred to as "PII" throughout this Complaint.

27.     On December 13, LoanCare announced the following Data Breach ("Notice of Data Breach"):

**What Happened?**

On or about November 19, 2023, Loan Care, LLC ("LoanCare"), which performs or has performed loan subservicing functions for your mortgage loan servicer, became aware of unauthorized access to certain systems within its parent's, Fidelity National Financial, Inc. ("FNF"), information technology network. Upon becoming aware of the incident, FNF commenced an investigation with the assistance of third-party experts, notified certain law enforcement and governmental authorities, and began taking measures to assess and contain the incident. The incident has been contained. The investigation has determined that an unauthorized third party exfiltrated data from certain FNF systems. As part of the review of the potentially

---

[1] *See* https://apps.web.maine.gov/online/aeviewer/ME/40/25bd9abc-608b-4a8a-8f35-ba5413b9399f.shtml (last visited: December 26, 2023).

[2] *Id.*

[3] *Id.*

impacted data, LoanCare identified that some of your personal information may have been among that data. It is important to note that we have not identified any fraudulent use of your personal information as a result of this incident.

**What Information Was Involved?**

Based on our investigation, we understand that your Name, Address, Social Security Number, and Loan Number may have been obtained by the unauthorized third party.

28.     On or about December 19, 2023, LoanCare notified affected individuals that their PII was impacted in the Data Breach.[4]

### *Defendants Were Aware of the Data Breach Risks*

29.     In light of recent high-profile data breaches at other companies in the financial industry, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

30.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[5]

---

[4] *Id.*

[5]*FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited June 23, 2021).

31.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

32.    Defendants had and continue to have obligations created by implied contract, industry standards, common law, and representations made to Plaintiff and the Class, to keep their PII private and confidential and to protect it from unauthorized access, disclosure or exfiltration.

33.    Plaintiff and the Class provided their PII to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to employ reasonable care to keep such information confidential and secure from unauthorized access.

34.    Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and data breaches in the banking, credit, and financial service industries preceding the date of the Data Breach.

35.    Indeed, data breaches, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.  Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and foreseeable to the public and to anyone in Defendants' industry, including Defendants.

36.    According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take

substantial time, money, and patience to resolve.[6] Identity thieves use the stolen PII for a variety of crimes, including but not limited to, credit card fraud, telephone or utilities fraud, and bank and finance fraud.[7]

37.    The PII of Plaintiff and the Class were access and taken by cyber criminals for the very purpose of engaging in illegal and unethical conduct, including crimes involving identity theft, fraud, or to otherwise profit by selling their data to other criminals who purchase PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

38.    Defendants knew, or should have known, the importance of safeguarding the PII of Plaintiff and the Class, including their SSN, driver's license numbers and/or state identification numbers, and of the foreseeable consequences that would occur if Defendants' data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class as a result of a breach.

---

[6] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited Nov. 24, 2021).

[7] *Id*. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

39.    Plaintiff and the Class now face years of constant monitoring and surveillance of their financial and personal records. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII as a direct result of the Data Breach.

40.    The injuries to Plaintiff and Class were directly and proximately caused by Defendants' own failure to install, implement or maintain adequate data security measures, software and other industry best practices for safeguarding the PII of Plaintiff and the Class.

### *PII is Valuable Intangible Property*

41.    The PII at issue in this case is valuable intangible property. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained. Other reports show that personal information can be sold at a price ranging from $40 to $200.[8] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[9]

42.    The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm

---

[8] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Oct. 27, 2021).

[9] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Oct. 27, 2021).

RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[10]

43.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[11] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[12] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[13]

44.     The integrity of PII gives it its value because PII is used to secure loans, open lines of credit, verify identities, and unlock government benefits. When PII is used to commit fraud, these simple everyday necessities become more

---

[10] Time Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10xprice-of-stolen-credit-card-numbers.html (last visited Dec. 13, 2023).

[11] *Data Brokers*, Los Angeles Times, Nov. 5, 2019, *available at* https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[12] *See, e.g.,* https://datacoup.com/ (last visited Dec. 13, 2023).

[13] *Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

difficult, if not impossible, due to lowered credit scores and tarnished credit histories from credit fraud and identity theft.[14]

45.     As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its acquisition by cybercriminals and is likely already available on the dark web due to its high value for threat actors. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

### *Defendants Failed to Comply with FTC Guidelines*

46.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable and adequate data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

47.     In 2022, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an

---

[14] https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-of-identity-theft (last visited Dec. 13, 2023).

intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[15]

48.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

49.     The FTC has brought enforcement actions against businesses for failing to protect consumer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50.     Defendants failed to properly implement basic data security practices, and its failure to employ reasonable and appropriate measures to protect against

---

[15] Ritchie, J. N. & A., & Jayanti, S.F.-T. and A. (2022, April 26). *Protecting personal information: A guide for business.* Federal Trade Commission. https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed October 27, 2023).

unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

51. To prevent and detect cyber attacks, including the cyber attack on Defendants network that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Government and FTC, the following measures:

    a.  Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of malware and how it is delivered;

    b.  Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing;

    c.  Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users;

    d.  Configure firewalls to block access to known malicious IP addresses;

    e.  Patch operating systems, software, and firmware on devices using a centralized patch management system;

f.  Set anti-virus and anti-malware programs to automatically conduct regular scans and/or repairs;

g.  Create and manage the use of privileged accounts based on the varying level of accessibility using a principle of least privilege: wherein no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary, such as any internal IT employees;

h.  Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares;

i.  Disable macro scripts from Microsoft Office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications;

j.  Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common malware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder;

k.  Consider disabling Remote Desktop protocol (RDP) if it is not being used;

l.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy;

m.  Execute operating system environments or specific programs in a virtualized environment; and

n.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

52.  Defendants were at all times fully aware of its obligation to protect the PII of customers, prospective customers and employees. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### *Defendants Failed to Comply with Industry Standards*

53.  A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendants' cybersecurity practices.  Best cybersecurity practices that are standard in the financial services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

54.     Upon information and belief, Defendants failed to meet the minimum standards of the following cybersecurity frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.  These frameworks are existing and applicable industry standards in Defendants' industry, and Defendants failed to comply with these accepted standards, thereby opening the door to the cyber-attack and causing the Data Breach.

55.     The occurrence of the Data Breach is indicative that Defendants failed to adequately implement one or more of the above measures to prevent or circumvent ransomware attacks or other forms of malicious cybercrimes, resulting in the Data Breach.

### Plaintiff's Experience

56.     Plaintiff provided Defendants and/or their agents with his PII, including Social Security number, as a condition of receiving mortgage services.

57.     Plaintiff expected that Defendants would take industry-standard precautions to protect, maintain, and safeguard his PII. Plaintiff would not have allowed Defendants to collect and maintain his PII had he known that Defendants would not take reasonable steps to safeguard his PII.

58.     On or around November 22, 2023, Plaintiff Grigg accessed attempted to access his mortgage account and saw the following message:

> LoanCare's ability to service your mortgage loan has been impacted by a Cybersecurity Incident. Websites at domain myloancare.com are currently offline, however our call center is available. We are working diligently to resolve the issue as quickly and safely as possible. In the meantime, no late charges will be incurred and there will be no negative credit reporting due to the outage. We will let you know as soon as we're back online.

59.     As a result, Plaintiff was unable to pay his mortgage.

60.     Plaintiff is also unable to pay his county taxes, which are escrowed and no longer available as a result of the Data Breach.

61.     Plaintiff has suffered actual injury and is at imminent, impending, and substantial risk for additional tangible and intangible harm as a result of the Data Breach. Plaintiff's injuries include, but are not limited to: a loss of privacy similar to that caused by a disclosure of private facts or intrusion upon seclusion; lost time value of funds that are inaccessible due to the Data Breach; time and effort spent attempting to mitigate the risk of harm from the Data Breach; lost benefit of bargain; diminished value of PII; and emotional distress proportional to the substantial risk of harm that he faces.

62.     As a result of the Data Breach, Plaintiff is presently and will continue to be at a present and heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for the rest of his life.

63.    Plaintiff has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Defendants, is protected and safeguarded from future data breaches.

## CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this nationwide class action according to Federal Rules of Civil Procedure, Rules 23(b)(2), 23(b)(3), and 23(c)(4).

65.    The nationwide Class that Plaintiff seeks to represent is defined as follows:

> All persons residing in the United States whose PII was compromised during the Data Breach that occurred on or about November 19, 2023 (the "Class").

66.    Excluded from the Class are: (i) Defendants and its employees, officers, directors, affiliates, parents, subsidiaries, and any entity in which Defendants have a whole or partial ownership of financial interest; (ii) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (iii) any counsel and their respective staff appearing in this matter; and (iv) all judges assigned to hear any aspect of this litigation, their immediate family members, and their respective court staff.

67.    Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

68.    **Numerosity**. The Class is so numerous that joinder of all members is impracticable.  The Class includes thousands of individuals whose personal data was compromised by the Data Breach.  The exact number of Class members is in

the possession and control of Defendants and will be ascertainable through discovery, but upon information and belief, there are more than one million similarly situated Class Members.

69.   **Commonality.**   There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any questions that may affect only individual Class members, including, without limitation:

    a.  Whether Defendants unlawfully maintained, lost or disclosed Plaintiff's and the Class's PII;

    b.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    d.  Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

    e.  Whether Defendants owed a duty to Class to safeguard their PII;

    f.  Whether Defendants breached duties to Class to safeguard their PII;

    g.  Whether cyber criminals obtained Class's PII in the Data Breach;

    h.  Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

     i.   Whether Plaintiff and Class suffered legally cognizable damages as a result of Defendants' misconduct;

     j.   Whether Defendants' conduct was negligent;

     k.   Whether Defendants' conduct violated federal law;

     l.   Whether Defendants' conduct violated state law; and

     m. Whether Plaintiff and Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

70.    **Typicality**. Plaintiff's claims are atypical of the claims of the Class in that Plaintiff, like all proposed Class members, had his PII compromised, breached, or otherwise stolen in the Data Breach.  Plaintiff and the Class were injured through the uniform misconduct of Defendant, described throughout this Complaint, and assert the same claims for relief.

71.    **Adequacy**.  Plaintiff and counsel will fairly and adequately protect the interests of Plaintiff and the proposed Class.  Plaintiff retained counsel who are experienced in Class action and complex litigation, particularly those involving Data Breach as is at issue in this class action complaint.  Plaintiff has no interests that are antagonistic to, or in conflict with, the interests of other Class members.

72.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.  Moreover, absent a class action, most Class members would find the cost of litigating their claims prohibitively high and would therefore have no

effective remedy, so that in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class. Plaintiff and the Class have been harmed by Defendants' wrongful conduct and/or action. Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendants' conduct and/or inaction. Plaintiff knows of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

73. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A), in that the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each member of the Class. Specifically, injunctive relief could be entered in multiple cases, but the ordered relief may vary, causing Defendants to have to choose between differing means of upgrading its data security infrastructure and choosing the court order with which to comply. Class action status is also warranted because prosecution of separate actions by Class members would create the risk of adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

74.     Class certification, therefore, is appropriate under Rule 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

75.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendants owed its legal duty or obligation to Plaintiff and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

b. Whether Defendants breached their legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, safeguarding, or otherwise maintaining their PII;

c. Whether Defendants failed to comply with its own policies or procedures and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

e.   Whether Plaintiff and the Class are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On behalf of Plaintiff and the Class)

76.   Plaintiff and the Class re-allege and incorporate paragraphs 1-75.

77.   Plaintiff and the Class entrusted Defendants with their PII.

78.   Plaintiff and the Class entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their information, use their PII for business purposes only, and not disclose their PII to unauthorized third parties.

79.   Defendants owed a duty to Plaintiff and the Class to exercise reasonable care in obtaining, using, maintaining and protecting their PII from unauthorized third parties.

80.   The legal duties owed by Defendants to Plaintiff and the Class include, but are not limited to the following:

a.   To exercise reasonable care in procuring, retaining, securing, safeguarding, deleting, and protecting the PII of Plaintiff and the Class in Defendants possession;

b.   To protect PII of Plaintiff and the Class in Defendants possession using reasonable and adequate security

procedures that are compliant with industry-standard practices; and

c.     To implement processes and software to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Plaintiff and Class of the Data Breach.

81.     Defendants' duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the Federal Trade Commission, the unfair practices by companies such as Defendants of failing to use reasonable measures to protect PII.

82.     Various FTC publications and data security breach orders further form the basis of Defendants' duty. Plaintiff and Class are consumers under the FTC Act. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and by not complying with industry standards.

83.     Defendants breached their duties to Plaintiff and the Class. Defendants knew or should have known the risks of collecting and storing PII and the importance of maintaining secure systems, especially in light of the fact that data breaches have recently been prevalent.

84.     Defendants knew or should have known that its security practices did not adequately safeguard the PII of Plaintiff and the Class.

85.     Through Defendants' acts and omissions described in this Complaint, including Defendants' failure to provide adequate security measures and its failure to protect the PII of Plaintiff and the Class from being foreseeably captured, accessed, exfiltrated, stolen, disclosed, and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure the PII of Plaintiff and the Class during the period it was within Defendants' possession and control.

86.     Defendants were subject to an "independent duty," untethered to any contract between Defendants and Plaintiff and the class.

87.     Defendants' own conduct created a foreseeable risk of harm to an individual, including Plaintiff and the Class.  Defendants' misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decisions not to comply with industry standards for safekeeping of the PII of Plaintiff and the Class, including basic encryption techniques freely available to Defendants.

88.     Defendants were in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

89.     Defendants had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiff and the Class.

90.     Defendants breached their duties it owes to Plaintiff and Class in several ways, including:

a. Failing to implement adequate security systems, protocols, and practices sufficient to protect employees' and customers' PII and thereby creating a foreseeable risk of harm;

b. Failing to comply with the minimum industry data security standards during the period of the Data Breach;

c. Failing to act despite knowing or having reason to know that its systems were vulnerable to attack; and

91.    There is a close causal connection between Defendants' failure to implement security measures to protect the PII of Plaintiff and Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.  The PII of Plaintiff and the Class was stolen and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

92.    Due to Defendants' misconduct, Plaintiff and the Class are entitled to credit monitoring at a minimum. The PII taken in the Data Breach can be used for identity theft and other types of financial fraud against Plaintiff and the Class.

93.    Some experts recommend that data breach victims obtain credit monitoring services for at least ten years following a data breach. Annual subscriptions for credit monitoring plans range from approximately $219 to $358 per year.

94.    As a result of Defendants' negligence, Plaintiff and Class suffered injuries that include:

> i.    the lost or diminished value of PII;
>
> ii.   out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII;
>
> iii.  lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including, but not limited to, time spent deleting phishing email messages and cancelling credit cards believed to be associated with the compromised account;
>
> iv.   the continued risk to their PII, which may remain for sale on the dark web and is in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession;
>
> v.    future costs in terms of time, effort, and money that will be expended to prevent, monitor, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class, including ongoing credit monitoring.

95.    These injuries were reasonably foreseeable given the history and uptick of data security breaches of this nature within the financial sector. The

injury and harm that Plaintiff and the Class suffered was the direct and proximate result of Defendants' negligent conduct.

## COUNT II
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

96.    Plaintiff and the Class re-allege and incorporate paragraphs 1-95.

97.    Plaintiff and the Class conferred a monetary benefit to Defendants by providing Defendants with their valuable PII, which Defendants knowingly used or retained in the course of its business.

98.    Defendants benefited from receiving Plaintiff's and the Class members' PII by its ability to retain and use that information for its own financial business benefit. Defendants understood this benefit and accepted the benefit knowingly.

99.    Defendants also understood and appreciated that the PII of Plaintiff and the Class was private and confidential to them, and that its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

100.    Plaintiff and the Class conferred a monetary benefit upon Defendants in the form of monies paid to Defendants for services.

101.    The monies paid to Defendants for services involving Plaintiff and the Class PII were to be used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

102.   Defendants also understood that Plaintiff's and the Class's PII was private and confidential, and its value depended upon Defendants maintaining the privacy and confidentiality of that PII.

103.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and the Class by utilizing cheaper, ineffective security measures. Plaintiff and the Class, on the other hand, suffered a direct and proximate result of Defendants' failure to provide the requisite security.

104.   But for Defendants' willingness and commitment to maintain privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendants. Indeed, if Defendants had informed its customers that Defendants' data and cyber security measures were inadequate, Defendants would not have been permitted to continue to operate in that fashion by regulators, its shareholders, and its consumers.

105.   As a result of Defendants' wrongful conduct, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class. Defendants continue to benefit and profit from their retention and use of the PII while its value to Plaintiff and the Class has been diminished.

106.   Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this complaint, including compiling, using, and retaining Plaintiff and the Class's PII, while at the same time failing to

maintain that information securely from intrusion and theft by cyber criminals, hackers and identity thieves.

107.    Plaintiff and the Class have no adequate remedy at law.

108.    Under principals of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Class because Defendants failed to implement (or adequately implement) the data privacy and security practices and procedures that Plaintiff and the Class paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

109.    Defendants acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

110.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm. Defendants should be completed to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, proceeds that they unjustly received from them.

111.    As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class have suffered, and will continue to suffer, ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss an economic harm; actual identify theft crimes, fraud, and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark

web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic time that the Plaintiff and Class have not been compensated for.

112.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm.

**COUNT III**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

113.    Plaintiff and the Class re-alleges and incorporates paragraphs 1-112.

114.    Plaintiff and the Class entrusted their PII with Defendants. In doing so, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached, compromised, or stolen.

115.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendants.

116.    Defendants breached the implied contract with Plaintiff and the Class by failing to safeguard and protect their PII and/or by failing to delete the PII of Plaintiff and the Class Members once their relationship ended.

117.     As a direct and proximate result of Defendants' above-described breach of implied contract, Plaintiff and the Class have suffered, and will continue to suffer, ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss an economic harm; actual identify theft crimes, fraud, and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic time that the Plaintiff and Class have not been compensated for.

118.     As a direct and proximate result of the Defendants' above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT IV**
**Declaratory Judgment and Injunctive Relief**
**(On behalf of Plaintiff and the Class)**

119.     Plaintiff and the Class re-allege and incorporate paragraphs 1-118.

120.     Under the Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

212.   An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard consumers' PII, and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiffs and Class Members remain at imminent risk that further compromises of their PII will occur in the future. This is true even if they are not actively using Defendants' products or services.

121.   Plaintiff, therefore, seeks a declaration that Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information, and prospective injunctive relief requiring Defendants to comply with their explicit or implicit obligations and duties of care, including, but not limited to:

   a.   Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

c.   Auditing, testing, and training its security personnel regarding any new or modified procedures;

d.   Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e.   Conducting regular database scanning and security checks;

f.   Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.   Purchasing credit monitoring services for Plaintiff and the Class for a period of ten years; and

h.   Meaningfully educating Plaintiff and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

122.   If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data

breach of Defendants. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

123.   The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendants if an injunction does issue. Among other things, if another data breach occurs to Defendants, Plaintiff and Class Members will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

124.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach to Defendants, thus eliminating additional injuries that would result to Plaintiff and Class Members whose PII would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, requests judgment against Defendants and that the Court grant the following:

1.     For an order certifying the Class and appointing Plaintiff and his counsel to represent the Class;

2.     For a declaration that Defendants' existing security measures do not comply with their explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect customers' personal information

3.     For an order enjoining Defendants from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of the PII belonging to Plaintiff and the Class;

4.     For injunctive relief requiring Defendants to:

    a.     Engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b.     Engage third-party security auditors and internal personnel to run automated security monitoring;

    c.     Audit, test, and train its security personnel regarding any new or modified procedures;

d.     Segment their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

e.     Conduct regular database scanning and security checks;

f.     Routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

g.     Purchase credit monitoring services for Plaintiff and the Class for a period of ten years; and

h.     Meaningfully educate Plaintiff and the Class about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

5.     An order instructing Defendants to purchase or provide funds for credit monitoring services for Plaintiff and all Class members;

6.     An award of compensatory, statutory, nominal and punitive damages, in an amount to be determined at trial;

7.     An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

8.     An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

9.     Any and all such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands this matter be tried before a jury.

Dated: December 27, 2023          Respectfully submitted,

/s/ Jonathan B. Cohen
Jonathan B. Cohen (FL Bar # 27620)
Lead Counsel
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
3833 Central Ave.
St. Petersburg, FL 33713
Phone: 813-699-4056
Email: jcohen@milberg.com
*jcohen@milberg.com*

Spencer D. Campbell *
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Fax: (513) 665-0219
*scampbell@msdlegal.com*

*Attorneys for Plaintiff and Putative Class*

*\* Motion for Special Admission forthcoming*